**Affirmed and Opinion filed November 19, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00307-CR

---

### ROYERICK WASHINGTON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 1247723**

---

## O P I N I O N

The State presented evidence that a gun battle erupted on the Eastex Freeway and a bullet struck Sashe Gray in the heart, killing her. A jury convicted appellant Royerick Washington of felony murder and assessed punishment at fifty years' confinement. Appellant challenges his conviction and sentence in six issues concerning the underlying felony for felony murder, the sufficiency of the

evidence, the effectiveness of counsel's representation, and alleged jury charge error.  We affirm.

## I.  BACKGROUND

It was Christmas 2009, and Club Motions was packed with teenagers having a good time.  Dalicia Donatta went to the club with her friend, the decedent Sashe Gray.  Appellant also went to the club with his acquaintances, Deandre Gray (no relation to Sashe), Deon Gibson, Charles Davis, Byron Edwards,[1] and Allen Prudhomme.  Another teenager, Eric Perkins, was also at the club.  Deandre had "disagreements" with Perkins in the past about Perkins's girlfriend.  The club closed its doors at about 2:00 a.m. on December 26, and its patrons left.

Donatta and Sashe headed home.  Donatta drove Sashe's white Mitsubishi Mirage while Sashe sat in the passenger seat.  When Donatta was getting on the southbound side of the Eastex Freeway via an elevated entrance ramp, she saw the taillights from multiple cars "swanging" on the freeway.  According to Donatta, "swanging" refers to cars that are switching or swerving from one lane to the next, zigzagging across multiple lanes.  She was accelerating on the freeway, and she got close to the swanging cars, which were going a slower speed.  Donatta saw three swanging cars—a white one, red one, and black one.  She did not recall seeing an SUV.

Meanwhile, appellant and his acquaintances also left the club.  After a brief stop, they entered the Eastex Freeway.  Deandre was driving his mother's green Isuzu Rodeo (an SUV).  Gibson sat in the front passenger's seat; appellant sat in the seat behind the driver's seat; Davis sat in the middle rear seat; Edwards sat to

---

[1] Edwards's first name is spelled "Byron" in the clerk's record and "Byrom" in the reporter's record.

the right of Davis in the seat behind the front passenger's seat; and Prudhomme sat in the rear-facing "storage area" of the vehicle.

Deandre, Gibson, Davis, and Prudhomme testified at appellant's trial. By the time of trial, Deandre and Edwards had been charged with murder in this case. Deandre and Gibson testified similarly that there were a number of cars swanging on the freeway. The Isuzu was in the far right lane. The swanging cars were to the left of them. No cars were to the right of them.

Davis, who was sitting next to appellant, testified that he heard appellant say, "They going to make me do something to them," and that appellant then started shooting. Deandre testified that Gibson grabbed him and said, "Duck," as the back window of the Isuzu was shot out. Deandre heard twenty to thirty gun shots. The Isuzu was being hit with bullets, but some of the shots came from behind him where appellant was sitting. Deandre did not actually see anyone shoot; he just heard the shots being fired from behind him. Gibson and Prudhomme testified that they did not know whether gunshots were coming from inside the Isuzu.

Regarding the shooting, Donatta testified that the cars eventually stopped swanging, and the black car was on her right side. Suddenly, Sashe said, "They shooting," and, "Duck." Sashe grabbed Donatta's right hand to pull her down. Donatta ducked down while she heard bullets going through her car and shattering one of her windows. Donatta testified that the black car sped up and drove away fast. She was paying attention to the black car because she thought shots came from that car. As Donatta was exiting the freeway onto Beltway 8, Donatta asked Sashe if she was all right. Sashe was slouched over and did not respond. Donatta called 911 and drove to a nearby hospital. Sashe died before 3:00 a.m.

3

Meanwhile, the Isuzu exited the freeway one or two exits before Beltway 8. There was some talking and arguing in the vehicle, and Gibson testified that he heard appellant say, "I shot." They stopped at a gas station, and Davis testified that he and others in the car grabbed shell casings from the car and threw them in a trash bin. Deandre dropped off the passengers at their homes and then went home.

Back on the freeway, Houston Police Department (HPD) Officer Christian Dorton was dispatched to the Eastex Freeway where two cars were parked on the side of the road with flat tires. Dorton observed multiple bullet holes in the two cars, and it appeared the tires had been shot out. All of the bullet holes he observed were on the passengers' sides of the cars. One of the cars was a red Oldsmobile; the other was a white Lincoln. Dorton recovered a 9-millimeter pistol from the Oldsmobile.

Also on December 26, Dr. Pramod Gumpeni, an assistant medical examiner with the Harris County Institute of Forensic Sciences, performed an autopsy of Sashe's body. He identified a bullet entrance wound to Sashe's right back, and the bullet came to rest in Sashe's left breast. The bullet had perforated Sashe's lung and heart, causing her death. The trajectory of the bullet was from back to front, from right to left, and very slightly upward.

HPD Sergeants Roger Chappell and Bobby Roberts investigated this case for the Homicide Division. Acting on Crime Stoppers tips, the sergeants were able to identify some of the participants in the shooting. They met with Perkins, who they learned had been driving a blue Buick LeSabre. Upon inspection, the Buick had bullet damage to the passenger's side and no bullet damage to the driver's side. Perkins gave Roberts a fired bullet.

HPD Crime Scene Investigator April Palatino processed four vehicles in this case: a green Isuzu Rodeo, a red or burgundy Oldsmobile Aurora, a white Lincoln

4

LS, and a white Mitsubishi Mirage.[2] The Oldsmobile, Lincoln, and Mitsubishi had no bullet entrance damage on the driver's sides; all three of these cars had bullet entrance damage to their passenger's sides. Only the Isuzu had bullet entrance damage on the driver's side. Further, there was a bullet hole in the Isuzu on the rear driver's side window frame area that caused the metal of the car to bow outwards. Palatino testified that this "exit strike" indicated a gun had been fired from inside the Isuzu and was consistent with someone firing a gun from the rear seat on the driver's side. She testified further that one of the entrance strikes to the Isuzu had been caused from a gun being fired toward the rear left of the Isuzu. She collected a bullet from the Isuzu and bullets or bullet fragments from the Lincoln and Oldsmobile.

Chappell testified about the angles of bullet entrances to the various vehicles. He testified that the Mitsubishi, Oldsmobile, and Buick were shot from behind and from the right (passenger's sides). So whoever was doing the shooting was located behind and to the right of those vehicles. The Lincoln was shot from more of a direct angle, from the right side. Finally, he testified that the angle of the exit strike from the rear driver's side window of the Isuzu "looks to be from back to front." Thus, "the angle of fire there [is] consistent with where these other vehicles were hit."

Roberts interrogated appellant on December 31. A video recording of the interrogation was played for the jury. Initially, appellant said he went to and left Club Motions with his cousin. He denied shooting a gun or being shot at on December 26. After Roberts told appellant that appellant's acquaintances confirmed appellant's presence in the Isuzu and suggested that the gas station

---

[2] Chappell testified that the blue Buick LeSabre was not processed for evidence because the vehicle had already changed hands since the shooting and some modifications had been made to the vehicle. However, pictures of the bullet damage were admitted into evidence.

appellant stopped at had video surveillance, appellant eventually admitted to being in the Isuzu. Appellant identified his acquaintances who were also in the Isuzu, but he said he was sitting in the rear seat behind Gibson on the passenger's side. He said Edwards was sitting in the rear seat behind Deandre on the driver's side. After further questioning, appellant said that Edwards had a gun and was shooting it, but appellant maintained that he was sitting on the right side of the vehicle and did not have a gun. Roberts told appellant that eventually charges would be filed against him.

Appellant was arrested on January 11, 2010, and Chappell and Roberts interrogated him again. This interrogation was recorded and played for the jury. Initially appellant denied having a gun and denied shooting. But eventually appellant admitted to having a gun and shooting it. He said, "I shot in the air, over everybody." He said Edwards was shooting a .45-caliber gun, but appellant did not know what kind of gun he was shooting. He also confirmed that he was sitting in the seat behind Deandre, on the driver's side of the Isuzu. Appellant suggested he could recover the gun for the sergeants, so they all went to appellant's grandmother's house for appellant to find a phone number and make a call. Roberts testified that appellant made a phone call to an unknown person, but "apparently, the guy either didn't have the gun, didn't want to bring the gun, what have you." The sergeants did not recover appellant's gun.

On cross-examination, Roberts testified that he interviewed Jarvis Hoskins, who had admitted to riding in one of the other cars and doing some of the shooting. But Roberts never obtained a gun from him and never saw his vehicle.

Tammy Reed testified that she worked for the HPD Crime Laboratory in the Firearms Section. Reed compared two bullets—the one that killed Sashe and the one from Perkins—and determined that both bullets were fired from the same gun.

6

The bullets were from the .38-caliber family consistent in weight and style with the 9-millimeter Luger. Reed compared the bullets with fired bullets from two 9-millimeter Luger pistols recovered in this case. She was able to eliminate one of the guns as firing the recovered bullets. The second pistol, which was the one Horton recovered from the red Oldsmobile, could not be eliminated or identified as firing the bullets. Further, Reed was able to determine that some of the other recovered bullet fragments were not fired by either of the two weapons, thus indicating there was an unrecovered weapon involved in the shooting.

Appellant was indicted and convicted of felony murder predicated on the felony of deadly conduct. *See* Tex. Penal Code Ann. § 19.02(b)(3) (felony murder); *id.* § 22.05(b)(2), (e) (felony deadly conduct). The jury charge authorized conviction as a principal or as a party by assisting Edwards or Deandre.

During the punishment phase, appellant's trial counsel called six witnesses—appellant's family members—to testify about his good character. Several of the witnesses also testified about how appellant's father had killed appellant's mother and then killed himself when appellant was about nine years old. In particular, appellant's grandmother testified that appellant was in counseling for two to three years. Appellant's great aunt testified about the murder-suicide: "I think it had a great impact on Royerick. [Appellant and his brothers] were counseled, but I don't think he ever let it go." The jury assessed punishment at fifty years' confinement.

Appellant, assisted by appellate counsel, filed a motion for new trial alleging ineffective assistance of counsel—in particular, "counsel failed to procure needed expert assistance and failed to conduct a full investigation to prepare for trial and punishment." Appellant attached an affidavit from appellant's great uncle, Robert Dade, who had testified at the original punishment hearing. Among other things,

7

Dade believed the murder-suicide "affected [appellant] very, very deeply" and "made him depressed and often afraid, sometimes so afraid that he did not always think rationally."[3]

At a hearing on the motion for new trial, appellant's trial counsel, Wilford Anderson, testified that he never sought funds for an investigator, mental health expert, or ballistics expert in appellant's case. Anderson testified that he discussed the deaths of appellant's parents with appellant's family members "to find out if there may have been some effect or something that we could use in trial [but] there was nothing that was brought up." Anderson also testified that he did not think it would have been useful to obtain psychological testimony about appellant, and he did not believe he made a mistake to not have a health professional evaluate appellant or present medical records to the jury.

Some of appellant's medical records were admitted at the hearing, including a "case history" form completed by appellant's grandmother at the DePelchin Children's Center when appellant was thirteen years old. There is a typed statement in the medical records: "Royerick is a child that is suffering from depression."[4]

At the hearing on the motion for new trial, Dade testified mostly about the deaths of appellant's parents, noting that appellant had trouble sleeping after the incident and had "a lot of nervousness issues." Appellant testified that he continued to have trouble sleeping and has nightmares. When the State asked appellant if he shot the gun due to his bad childhood experiences, appellant

---

[3] Appellant also filed a motion for the appointment of a mental health expert to determine the possible impact that the murder-suicide of appellant's parents had on appellant. Appellant identified a specific "competent and qualified specialist in the field of psychology" who would charge $3,000 to diagnose appellant. The trial court granted this motion.

[4] It is not clear who typed this statement or whether this was a clinical diagnosis.

testified, "I shot the gun out of fear, like anybody else would do if you were being shot at." He testified that he was not thinking about his parents when he pulled the trigger.

Appellant did not present any expert testimony at the hearing or by affidavit. The trial court denied the motion for new trial, and appellant appealed.

## II. DEADLY CONDUCT AS THE UNDERLYING FELONY

In his fifth issue, appellant contends his conviction and sentence are void because the underlying felony of deadly conduct is a lesser included offense of manslaughter. *See Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999) ("[A] conviction for felony murder . . . will not lie when the underlying felony is manslaughter or a lesser included offense of manslaughter.").

This court has not addressed this issue, but it appears "well established under Texas law that deadly conduct can be the underlying felony for felony murder." *Miles v. State*, 259 S.W.3d 240, 247 (Tex. App.—Texarkana 2008, pet. ref'd); *accord Yandell v. State*, 46 S.W.3d 357, 361 (Tex. App.—Austin 2001, pet. ref'd); *see Rodriguez v. State*, 953 S.W.2d 342, 354 (Tex. App.—Austin 1997, pet. ref'd), *cited with approval in Lawson v. State*, 64 S.W.3d 396, 401 (Tex. Crim. App. 2001) (Cochran, J., concurring).[5]

We agree with *Yandell*, which held that felony deadly conduct was not a lesser included offense of manslaughter and could serve as the underlying felony in a felony murder prosecution. 46 S.W.3d at 361. The offense of manslaughter

---

[5] *See also Aviles v. State*, No. 01-09-01017-CR, 2011 WL 346436, at *5 (Tex. App.—Houston [1st Dist.] Feb. 3, 2011, pet. ref'd) (mem. op., not designated for publication); *Price v. State*, No. 04-04-00886-CR, 2006 WL 927282, at *2 (Tex. App.—San Antonio Apr. 12, 2006, pet. ref'd) (mem. op., not designated for publication); *Arellano v. State*, No. 05-02-01200-CR, 2003 WL 22480926, at *1 (Tex. App.—Dallas Nov. 4, 2003, no pet.) (mem. op., not designated for publication).

would have required proof that appellant recklessly caused the death of an individual, but deadly conduct required proof that appellant ***knowingly*** discharged a firearm at a vehicle and was reckless as to whether the vehicle was occupied. *Compare* Tex. Penal Code Ann. § 19.04(a) (manslaughter), *with id.* § 22.05(b)(2) (felony murder). None of the methods for establishing a lesser included offense apply in this case, as outlined in Article 37.09 of the Texas Code of Criminal Procedure.[6] In particular, the offense of deadly conduct required proof of more facts (discharging a firearm at a vehicle) with a greater mental state (knowingly) compared to the offense of manslaughter. *See Yandell*, 46 S.W.3d at 361.

Appellant's fifth issue is overruled.

### III.  SUFFICIENCY OF THE EVIDENCE

In his fourth issue, appellant contends the evidence is insufficient to convict him under *Jackson v. Virginia*, 443 U.S. 307 (1979), either as a principal actor or as a party. In particular, appellant contends the State failed to prove that appellant "was linked to the fatal shot," and there is "no way to ever know how or who fired the fatal bullet." Regarding party liability, appellant argues that there is no evidence appellant acted at the behest of another or that he fired first.

"In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the

---

[6] *See* Tex. Code Crim. Proc. Ann. art. 37.09 ("An offense is a lesser included offense if: (1) it is established by proof of the same or less than all facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense.").

10

essential elements of the crime beyond a reasonable doubt." *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013) (quotations omitted). We "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Id.* (quotations omitted). "[I]t is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilt is warranted by the cumulative force of all the incriminating evidence." *Id.* (quotations omitted).

The State was required to prove that appellant committed or attempted to commit the felony of deadly conduct, and in the course of and in furtherance of the commission or attempt, or in the immediate flight from the commission or attempt, appellant committed or attempted to commit an act clearly dangerous to human life that caused the death of Sashe Gray. *See* Tex. Penal Code Ann. § 19.03(a). Appellant does not contest the sufficiency of the evidence for the underlying felony of deadly conduct, or that he committed an act clearly dangerous to human life. He contends there is insufficient evidence that he caused Sashe's death.

We conclude that the State adequately linked appellant to the fatal shot to uphold his conviction as a principal. The evidence recited above is sufficient, but we note the following in particular:

- Donatta testified that she was driving near the three swanging cars at the time of the shooting;
- Appellant's acquaintances in the Isuzu testified that all of the other vehicles were in the lanes to their left;
- Sashe's Mitsubishi and the Oldsmobile, Buick, and Lincoln all had bullet entrance damage to the passengers' sides, and no entrance damage to the drivers' sides, which is consistent with appellant's firing a gun from the Isuzu;

11

- The bullet exit strike on the rear driver's side window frame of the Isuzu is consistent with appellant's firing a gun in the direction of the other vehicles;

- Appellant confessed to shooting his gun at the time Sashe was shot, and the jury could have disbelieved his self-serving statement that he was merely shooting in the air;

- A fact finder could have inferred that appellant repeatedly lied to the police and disposed of his gun.

The cumulative force of the evidence points to appellant's guilt as a principal, and a rational fact finder could have found beyond a reasonable doubt that appellant caused Sashe's death.[7]

Appellant's fourth issue is overruled.

## IV. JURY CHARGE ERROR

In his sixth issue, appellant contends it was "fundamental error to include a party definition when there was no possible way to sustain a party instruction under these facts." We disagree and hold that any error was harmless.

A trial court errs in submitting a party instruction when there is no evidence that would support a jury's verdict under that theory. *See Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). "A person is a criminally responsible party to an offense 'if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.'" *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting Tex. Penal Code Ann. § 7.01). "A person is criminally responsible for the conduct of another if, acting 'with intent to promote or assist the commission of the offense, he solicits, encourages, directs,

---

[7] Because there is sufficient evidence of guilt as a principal, we need not address guilt as a party. *See Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992); *Davis v. State*, 195 S.W.3d 311, 319 n.4 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also* Tex. R. App. P. 47.1.

aids, or attempts to aid the other person to commit the offense.'" *Id.* (quoting Tex. Penal Code Ann. § 7.02).

"To determine whether an individual is a party to an offense, the reviewing court may look to events before, during, and after the commission of the offense." *Id.* (quotations omitted). "There must be sufficient evidence of an understanding and common design to commit the offense." *Id.* There must be some evidence that the individual anticipated the offense or encouraged the commission of the offense by words or agreement made prior to or contemporaneous with the act. *Id.* at 188.

There was some evidence that appellant could be held criminally responsible for the conduct of another. Before the commission of the offense, he said, "They going to make me do something to them," and then appellant shot a gun at the other cars. Thus, there is evidence that appellant anticipated the offense and encouraged the commission of the offense prior to or contemporaneous with the offense. He could be held criminally responsible for the conduct, if any, of Deandre or Edwards—the two of appellant's acquaintances who were named in the party liability charge.

Regardless, even if it was error to submit a party instruction concerning Deandre or Edwards, appellant did not object, and we may not reverse his conviction unless we find egregious harm. *See Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984)). To determine egregious harm, we must consider (1) the entire jury charge, (2) the state of the evidence, including contested issues and the weight of the probative evidence, (3) arguments of the parties, and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* "Jury charge error is

egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.*

In addition to authorizing conviction as a party, the charge authorized conviction as a principal, and the weight of the probative evidence supports appellant's conviction as a principal. Although the State suggested in closing argument that the jury could find appellant guilty if Edwards fired the fatal shot, the State did not mention Deandre and focused on appellant's guilt as the primary actor. Under these circumstances, "'[w]here [as in the instant case] the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless.'" *Ladd*, 3 S.W.3d at 564–65 (alterations in original) (quoting *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986)). This is because if there was "no evidence tending to show appellant's guilt as a party, the jury almost certainly did not rely upon the parties instruction in arriving at its verdict, but rather based the verdict on the evidence tending to show appellant's guilt as a principal actor." *Id.* at 565.

Appellant's sixth issue is overruled.

## V. INEFFECTIVE ASSISTANCE

In his first three issues, appellant contends trial counsel, Wilford Anderson, rendered ineffective assistance based on his alleged failure to investigate and present certain evidence and objections during trial, request three jury instructions, and investigate for punishment regarding appellant's mental health. We address each contention after reviewing the standard for proving ineffective assistance.

## A. Standard of Review and Principles of Law

To prevail on an ineffective assistance claim, an appellant must show that (1) counsel's performance was deficient by falling below an objective standard of

reasonableness; and (2) counsel's deficiency caused the appellant prejudice—there is a probability sufficient to undermine confidence in the outcome that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Perez v. State*, 310 S.W.3d 890, 892–93 (Tex. Crim. App. 2010). An appellant must satisfy both prongs by a preponderance of the evidence; failure to demonstrate either deficient performance or prejudice will defeat a claim of ineffectiveness. *Perez*, 310 S.W.3d at 893. When one of the prongs is dispositive, we need address only that prong on appeal. *See Seamster v. State*, 344 S.W.3d 592, 594 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

Although an appellant may claim ineffective assistance of counsel for the first time on direct appeal, the record in such a case often will not be sufficient to overcome the presumption that counsel's conduct was reasonable and professional. *Cannon v. State,* 252 S.W.3d 342, 349 (Tex. Crim. App. 2008). In such a case, we will not find deficient performance unless counsel's conduct is so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

When a defendant asserts ineffective assistance of counsel in a motion for new trial, we review the trial court's denial of the motion for an abuse of discretion. *My Thie Tieu v. State*, 299 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). We review de novo the trial court's decision on the prejudice prong while giving deference to the trial court's implied resolution of underlying factual determinations. *Seamster*, 344 S.W.3d at 594–95.

## B.    Failure to Investigate, Introduce Evidence, and Object

In his second issue, appellant contends Anderson "failed to investigate and prepare a proper guilt innocence defense." In particular, appellant complains that

Anderson did not retain the services of an investigator, testimonial expert, or consulting expert; he did not "challenge the State's witnesses [sic] qualifications under a 702/703 hearing"; he did not "conduct any investigation of his own"; and he did not "effectively cross the accomplices whom the State brought forward."

Because appellant failed to present any guilt-innocence mitigation evidence with the motion for new trial or at the hearing, appellant has failed to demonstrate how any of the alleged "failure to investigate" deficiencies prejudiced his defense. To determine whether appellant was prejudiced, we must "compare the evidence presented by the State with the 'evidence the jury did *not* hear due to trial counsel's failure to investigate.'" *Perez*, 310 S.W.3d at 896 (quoting *Butler v. State*, 716 S.W.2d 48, 56 (Tex. Crim. App. 1986)). We are unable to do so because appellant did not show what evidence a proper investigation would have revealed, nor what benefit could have been obtained from an expert. *See Ex parte McFarland*, 163 S.W.3d 743, 755 (Tex. Crim. App. 2005) (no prejudice for failure to investigate a witness when there was no showing or suggestion that the witness would have told anyone of the contradictory version of events before trial); *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) ("Counsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony."); *Brown v. State*, 334 S.W.3d 789, 803 (Tex. App.—Tyler 2010, pet. ref'd) ("[T]he failure to request the appointment of an expert witness is not ineffective assistance in the absence of a showing that the expert would have testified in a manner that benefitted the defendant."); *Cate v. State*, 124 S.W.3d 922, 927 (Tex. App.—Amarillo 2004, pet. ref'd) (same).

Appellant has also failed to demonstrate ineffective assistance regarding counsel's failure to object to the State's expert witnesses' qualifications because he

has not shown that the trial court would have abused its discretion by overruling counsel's objection. *See, e.g.*, *Alexander v. State*, 282 S.W.3d 701, 705, 710 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). Similarly, appellant has failed to demonstrate deficient performance regarding counsel's cross-examinations of any accomplice witnesses when he has not shown that counsel's conduct, which actually included cross-examining the alleged accomplices, lacked a sound trial strategy. *See, e.g.*, *Ex parte McFarland*, 163 S.W.3d at 756; *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd).

Appellant's second issue is overruled.

## C. Failure to Request Jury Instructions

In his third issue, appellant contends counsel was ineffective for failing to request jury instructions on the issues of accident, manslaughter, and accomplice witness.

To demonstrate deficient performance based on the failure to request a jury instruction, an appellant must show that he was entitled to the instruction. *See Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999) (lesser included). When an appellant has nothing to lose by requesting a defensive instruction and it would have been error for the trial court to refuse the instruction, we may find deficient performance even without counsel's explanation for failing to request the instruction. *See Vasquez v. State*, 830 S.W.2d 948, 951 (Tex. Crim. App. 1992) (defense of necessity); *Ex parte Zepeda*, 819 S.W.2d 874, 877 (Tex. Crim. App. 1991) (accomplice witness).

17

We address each of appellant's contentions in turn.

### 1. *Accident*

Appellant has failed to show that he was entitled to an "accident" instruction because he had no "accident" defense. *See, e.g.*, *Alford v. State*, 866 S.W.2d 619, 622–23 (Tex. Crim. App. 1993). To the extent he claims that counsel should have requested an instruction under Section 6.01(a) of the Penal Code regarding the voluntariness of his conduct, *see* Tex. Penal Code Ann. § 6.01(a), he would not have been entitled to the instruction because there is no evidence that the gun discharged as a result of an involuntary bodily movement. *See Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993). Evidence that one of appellant's shots hit the window frame of his own vehicle, or that the bullet that struck Sashe may have ricocheted, does not indicate that appellant involuntarily discharged the gun. *Compare Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997) (jury instruction required when the defendant testified a handgun in his possession accidentally discharged after he was bumped from behind), *with George v. State*, 681 S.W.2d 43, 44, 46–47 (Tex. Crim. App. 1984) (no jury instruction required when the defendant cocked the gun and held it to the victim's face although the defendant testified the hammer "slipped off [his] thumb" and he did not intend to shoot). Conduct is not involuntary "merely because an accused does not intend the result of his conduct." *George*, 681 S.W.2d at 45.

Counsel was not ineffective for failing to request a jury instruction on "accident."

### 2. *Manslaughter*

"[I]t is a reasonable trial strategy to decide to not request a charge on a lesser included offense." *Davis v. State*, 930 S.W.2d 765, 768 (Tex. App.—Houston [1st

Dist.] 1996, pet. ref'd); *see also Ex parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004) (no ineffective assistance for failing to request a lesser included offense instruction on manslaughter when the defendant preferred to adopt an all-or-nothing trial strategy). Assuming without deciding that manslaughter could ever be a lesser included offense of felony murder,[8] the record contains no explanation for trial counsel's failure to request a manslaughter instruction. The decision to not request a lesser included could have been strategic; thus, appellant has failed to show deficient performance. *See, e.g.*, *Wingo v. State*, 143 S.W.3d 178, 192 (Tex. App.—San Antonio 2004) (no deficient performance for failing to request an applicable lesser included instruction), *aff'd*, 189 S.W.3d 270 (Tex. Crim. App. 2006).

### 3. *Accomplice Witness*

We do not address whether counsel's performance was deficient because appellant suffered no prejudice.[9] When counsel fails to request an accomplice witness instruction under Article 38.14 of the Texas Code of Criminal Procedure,[10] the question of prejudice will "generally turn on whether there was a substantial amount of non-accomplice evidence and whether the record reveals any rational

---

[8] We do not hold that manslaughter is a lesser included offense of felony murder. *See Driver v. State*, 358 S.W.3d 270, 279 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (holding that "manslaughter is not a lesser included offense of felony murder"; concluding that *Kuykendall v. State*, 609 S.W.2d 791 (Tex. Crim. App. 1980), was overruled *sub silentio* by *Lomax v. State*, 233 S.W.3d 302 (Tex. Crim. App. 2007)).

[9] Regarding deficient performance in this context, see, e.g., *Zamora v. State*, No. PD-1395-12, — S.W.3d —, 2013 WL 5729980, at *8 (Tex. Crim. App. Oct. 23, 2013) ("The accomplice-witness rule cannot be reasonably categorized as a defensive issue that a defense attorney might forego as a matter of trial strategy.").

[10] *See* Tex. Code Crim. Proc. Ann. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.").

basis on which the jury could have doubted or disregarded that evidence." *Davis v. State*, 278 S.W.3d 346, 353 (Tex. Crim. App. 2009).[11]

To measure the non-accomplice testimony, we must first identify which witnesses were accomplice witnesses. Appellant contends that all of the witnesses in the Isuzu were accomplices; the State contends none of them were. We disagree with both assertions.

Deandre was an accomplice witness as a matter of law because he had been indicted for the murder of Sashe. *See Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991). And for the purpose of addressing prejudice, we will also assume that the record contains some evidence that Prudhomme was an accomplice witness, so appellant would have been entitled to a jury determination of that factual issue.[12] *See Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006) (explaining that a jury must determine if a witness is an accomplice as a matter of fact when the evidence is conflicting or unclear). However, appellant has failed to identify, and we have not found in the record, any evidence that Gibson and Davis were accomplice witnesses, so appellant would not have been entitled to a jury determination for those witnesses. *See id.* (an accomplice must participate and act with the requisite culpable mental state; mere presence and failure to disclose knowledge of a crime do not make an individual an accomplice). Therefore, we will consider Gibson's and Davis's testimony as non-accomplice evidence.

Excluding Deandre's and Prudhomme's testimony, the evidence of appellant's guilt is substantial. Davis testified that he heard appellant say, "They

---

[11] This test is distinguished from a seemingly laxer sufficiency standard: "whether the non-accomplice evidence sufficed to connect the defendant to the crime charged or even whether such evidence would itself support the verdict of guilt." *Davis*, 278 S.W.3d at 353.

[12] Appellant claimed in his statement to police that Prudhomme handed Edwards a gun immediately before Edwards and appellant began shooting.

20

going to make me do something to them," and then appellant started shooting. Appellant confessed to shooting his gun, and Gibson testified that he heard appellant say, "I shot," after the shooting. Further, appellant disposed of his gun after the shooting and repeatedly lied to the police about shooting his gun and where he was sitting in the Isuzu. Both Gibson and Davis testified that the Isuzu was in the far right lane at the time of the shooting, thus supporting Sergeant Chappell's and Investigator Palatino's testimony concerning the relative locations of the vehicles. The record reveals no substantial rational basis for doubting or disregarding the non-accomplice evidence.

We conclude there is not a probability sufficient to undermine our confidence in the outcome that but for counsel's errors, if any, the result of the proceeding would have been different.

Appellant's third issue is overruled.

## D.     Failure to Investigate for Punishment

In his first issue, appellant contends the trial court abused its discretion by denying his motion for new trial because counsel "conducted no investigation for punishment what so ever." We hold that appellant has failed to demonstrate prejudice.

In determining whether an appellant has been prejudiced by counsel's failure to investigate and discover mitigating evidence for punishment, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. State*, 539 U.S. 510, 534 (2003); *accord Ex parte Martinez*, 195 S.W.3d 713, 730 (Tex. Crim. App. 2006). However, most of the evidence presented at the hearing on appellant's motion for new trial was duplicative of evidence presented during the original punishment hearing. The jury had already heard about the

21

deaths of appellant's parents and that despite receiving counseling, appellant never "let it go." The truly new evidence—that appellant was depressed six years before he shot Sashe and that he had trouble sleeping and "nervousness issues" in the past—likely would not have had an effect on appellant's punishment. *See Ex parte Martinez*, 195 S.W.3d at 731 ("[S]ince the jury was privy to some of the severe abuse applicant suffered during his childhood, there is not a reasonable probability that the unadmitted alleged mitigating evidence would have tipped the scale in applicant's favor," despite the omitted mitigating evidence about his abuse being "strong."). Appellant did not show that the new mitigating evidence "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Id.* (citing *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)).

Accordingly, appellant failed to prove ineffective assistance by a preponderance of the evidence, and the trial court did not abuse its discretion by denying appellant's motion for new trial.

Appellant's first issue is overruled.

### CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/ Sharon McCally
   Justice


Panel consists of Justices McCally, Busby, and Wise.

Publish — Tex. R. App. P. 47.2(b).

22